IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ANESTHESIA HEALTHCARE
PARTNERS INC, et al.,
     Plaintiffs,

v.                              Case No: 3:11cv149/MCR/EMT

ANESTHESIA HEALTHCARE
SOLUTIONS OF NORTH FLORIDA LLC, et al.
     Defendants.

---

## REPORT AND RECOMMENDATION

       Before the court is plaintiffs' motion for a preliminary injunction (doc. 7), which was referred to the undersigned on April 29, 2011.  Plaintiffs seek to enjoin defendants Anesthesia Healthcare Solutions of North Florida, LLC ("AHS"), David W. Simpson, M.D. ("Dr. Simpson"), and Brett S. Sullivan, M.D., from using the name "Anesthesia Healthcare Solutions" because they contend it is an unlicensed use of their proprietary mark in violation of the Lanham Act, Title 15 U.S.C. §§ 114 et seq (*id.*).  Plaintiffs further seek to enjoin AHS and Dr. Simpson from providing anesthesia related services to Baptist Hospital, Inc. (*id.*).  Defendants responded in opposition (doc. 8), and the court granted plaintiffs motion for leave to reply (*see* docs. 14, 17, 19).  The court held an evidentiary hearing on May 16, 2011, during which the parties submitted exhibits and presented arguments.  After careful consideration, it is the opinion of the undersigned that plaintiffs' motion for a preliminary injunction should be denied.

## FACTUAL BACKGROUND

On October 26, 2006, Anesthesia Healthcare Partners of Florida, Inc. ("AHP") entered into an agreement ("Hospital Agreement") with Baptist Hospital, Inc., ("Baptist") to provide anesthesia services to Baptist, including administrative support and medical staff (doc. 8, ex. 2).  The contract commenced February 1, 2007, and continued for three years, until it ended on its terms on January 31, 2010 (doc. 8, p.1).

To fulfill its contract with Baptist, on June 18, 2007, AHP entered into the Physician Independent Contractor Agreement ("Agreement") with defendant Santa Rosa Anesthesia Associates, P.A. ("Santa Rosa") .[1]  The Agreement references the Hospital Agreement explicitly and states:

> Pursuant to the Hospital Agreement AHP has agreed to contract with various Anesthesiologists . . . as are necessary and appropriate to provide administrative and professional services at the Hospital's Department of Anesthesiology . . ..

The parties to the Agreement were:

> Anesthesia Health Care Partners of Florida, Inc., a Florida corporation ("AHP") and Santa Rosa Anesthesia Associates, P.A., a professional association licensed in the State of Florida ("Physician").

(Doc. 8, ex. 6, p. 1).  As will be discussed in more detail below, Drs. Simpson and Sullivan are defendants to this case but were not parties to the agreement.

AHP agreed to pay "Physician" an annual stipend that increased contractually each year until the Agreement ended by its terms on June 4, 2010 (doc. 8, ex. 6, p. 1, ¶ 5; p. 4, ¶ 1).  In return, "Physician" agreed to provide anesthesia services and abide by a list of terms and conditions for the duration of the agreement (*id.* at p. 2-4).  In addition, "Physician" agreed to the following restrictive covenants:

---

[1]  The Agreement states it is "dates as of the 18th day of June, 2007," and Simpson signed the Agreement on June 18, 2007.  AHP's representative did not sign until July 9, 2007 (doc. 8, ex. 6).

8.   Not directly or indirectly, alone or as a partner, officer, director, shareholder, or employee of any other entity, provide anesthesiology services of any type within a two (2) mile radius of Hospital during the term of this Agreement and for a period of one (1) year after the termination or expiration of this Agreement for any reason, absent AHP's prior written approval.  Physician agrees that breach of this provision, which he/she acknowledges is reasonable in both scope and duration, shall cause irreparable harm to AHP for which monetary damages cannot be calculated.

   . . .

10.   For a period of one (1) year after the termination or expiration of the Agreement for any reason, not solicit, directly or indirectly, with anyone currently employed with or contracted by AHP to terminate their employment or engagement with AHP and to become employed or engaged by any business enterprise with which Physician may then be associated, affiliated or connected.

11.   Except to the extent contemplated in the event of a Direct Service Agreement, relinquish all privileges in anesthesia and resign from the medical staff of Hospital effective with the termination of this Agreement.

(Doc. 8, ex. 6, p. 3).  The execution block of the agreement read "FOR:  PHYSICIAN" and "FOR:  AHP" (*id.* at 9).  Simpson signed for "Physician",  and Greg Wachowiak, CEO of AHP, signed for AHP (*id.*).

The Hospital Agreement terminated at the end of January 2010 and the Agreement ended the following June 4.  Baptist and AHP negotiated for a new contract but were unable to reach agreement and discontinued negotiations in July 2010 (doc. 8, p. 2 and ex. 1).  Meanwhile, the parties continued to perform under the terms of both the Hospital Agreement and the Agreement.  In August 2010, Dr. Simpson submitted a proposal to Baptist's administrator to become the new anesthesia provider (doc. 8, ex. 1, ¶ 8).  When negotiations with AHP fell through, Baptist management had decided the hospital was not going to enter into a new agreement with AHP regardless of circumstances, and it accepted Dr. Simpson's

proposal (*id.* at ¶ 9).  Dr. Simpson formed AHS on August 11, 2010, to provide services to Baptist (doc. 7, p. 8; doc. 8, ex,5, ¶ 9). On October 4, Baptist sent AHP a letter terminating its services as of November 5, 2010 (doc. 8, ex. 3).  AHP terminated its agreement with Santa Rosa on or about the same day (doc. 7, p. 5).

During November 2010, Baptist's management and attorneys exchanged several emails and telephone calls with AHP representatives, during the course of which AHP represented it was not releasing Dr. Simpson from the non-compete and non-solicitation clauses of the Agreement (doc. 8, ex. 1, ¶ 11; doc. 19, ex. 1, ¶ 10-11; pl.'s ex. 2).  At some later point, AHP also learned that its former employee, Aaron Barter, was working for AHS; AHP believes Dr. Simpson solicited Barter (doc. 19, ex. 1, ¶¶ 25-26).

Plaintiffs instituted this action on March 28, 2011, alleging several counts of breach of contract, tortious interference with contractual relationships, trademark infringement, dilution of trademark, and violation of the Florida Trade Secrets Act, Florida Statutes Sections 688.001 et seq. (doc. 1).  On April 1, 2011, plaintiffs filed the motion for preliminary injunction under consideration.

## LEGAL STANDARD - PRELIMINARY INJUNCTION

Plaintiffs seek a preliminary injunction to stop defendants from performing anesthesia services for Baptist and using the AHS business name.  To succeed on a motion for preliminary injunction, the moving party must show:

> (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to plaintiffs outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest.

*Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Co.*, 51 F.3d 982, 985 (11th Cir. 1995)); *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000).  "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion as to the four requisites." *Int'l*

*Cosmetics Exchange, Inc.,* 303 F.3d at 1206; *Siegel*, 234 F.3d at 1176; *see also Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule").[2]  The purpose of a preliminary injunction is to preserve the status quo while the case is litigated, and in considering whether to issue an injunction, the court must balance "the conveniences of the parties pending the final adjudication with consideration being given to whether greater harm might come from granting the injunction or denying it."  *Dent Wizard Int'l Corp. v. Brown*, 612 S.E.2d 873, 875 (Ga. Ct. App. 2005).

A.  Plaintiffs' First Required Proof:  Substantial Likelihood of Success on the Merits

Plaintiffs make two primary claims here.  First, they claim that Dr. Simpson and Dr. Sullivan conspired to create a new corporation under which they are doing business, and that the name of their corporation, AHS, is so close to and so easily confused with AHP's registered marks as to constitute trademark infringement. Second, plaintiffs say that Dr. Simpson breached restrictive covenants in the Agreement by (a) violating the non-compete portion of the Agreement by contracting with Baptist to provide anesthesia services, (b) soliciting away an AHP employee, and (c) not surrendering his hospital privileges at Baptist.  In order to keep the two issues separated (although there is a great deal of overlap), the following discussion will deal with each of the two main issues as they relate to the plaintiffs' burden of proof.

1.  Independent Contractor Agreement

Under Georgia law, the elements for a breach of contract claim are breach and damages to a party with the right to complain.[3]  *Graham Bros.' Const. Co., Inc. v. C.W. Matthews Contracting Co., Inc.*, 285 S.E.2d 282, 286 (Ga. Ct. App. 1981);  Ga.

---

[2]  In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[3]  The Independent Contractor Agreement states that the parties agree to construe and enforce the Agreement in accordance with the laws of the State of Georgia (doc. 8, ex. 6, p. 7, ¶ 12).

Code. Ann. § 13-3-1 (West 2010).  Plaintiffs are seeking a preliminary injunction to enforce restrictive covenants within the contract.  Georgia courts apply three levels of scrutiny to restrictive covenants depending on the type of contract.  *Dent Wizard Int'l Corp.,* 612 S.E.2d 873, 875.  Strict scrutiny applies to employment contracts, middle or "lesser" scrutiny applies to professional partnership agreements, and low scrutiny applies to sale of business agreements.  *Id.*  The principle lies in the suspicion of restraints in trade:

> A restrictive covenant in an employment agreement is in partial restraint of trade and will be enforced only if the restraint imposed is reasonable, is founded on a valuable consideration, is reasonably necessary to protect the interest of the party in whose favor it is imposed, and does not unduly prejudice the interests of the public.

*Waldeck v. Curtis 1000, Inc.*, 583 S.E.2d 266 (Ga. Ct. App. 2003).  Professional partnership agreements are analyzed with middle level scrutiny because parties generally have equal bargaining power, the restrictions are mutually advantageous to the parties, and "consideration flows equally among the contracting parties." *Physician Specialists in Anesthesia, P.C. v. MacNeill*, 539 S.E.2d 216, 221 (Ga. Ct. App. 2000).  A restrictive covenant in a partnership agreement will be enforced if it is reasonable.  The court in *MacNeill* stated:

> The reasonableness of a restrictive covenant is determined by examining its duration, territorial coverage, and scope of prohibited activity.  This tripartite test is not applied arbitrarily, but as a helpful tool in examining the reasonableness of the underlying factual setting.

*Id.* at 222 (internal quotations omitted).  A court can issue a preliminary injunction only on an enforceable restrictive covenant.  Furthermore, if a contract contains one unenforceable restrictive covenant, all other restrictive covenants are also unenforceable; Georgia courts do not employ the "blue pencil" doctrine to sever unenforceable covenants from the contract.  *Waldeck*, 583 S.E.2d at 269; *Advance Tech. Consultants, Inc. v. Roadtrac, LLC*, 551 S.E.2d 735, 737 (Ga. Ct. App. 2001).

### 2.  Trademark Infringement

To prevail on a trademark infringement claim, a plaintiff must show: (1) that defendant used its mark in commerce without the registrant's consent; and (2) that the unauthorized use was likely to deceive, cause confusion, or result in mistake. 15 U.S.C. § 1114 (2006);  *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir.1998).

### B.  Plaintiffs' Second Required Proof:  Substantial Threat of Irreparable Injury

### 1.  Restrictive Covenants

The threat of economic loss alone does not justify a preliminary injunction. *Ferrero v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) ("An injury is irreparable only if it cannot be undone through monetary remedies." (internal quotations omitted)).  Furthermore, it is inappropriate to "compare the actual losses sustained to the size of the company."  *Id.* (injunction is still proper when it would cause former employee to lose over 50% of income while employer would lose just 2.3%).  In contrast, the Eleventh Circuit has held that the loss of customers and goodwill is an irreparable injury.  *Bellsouth Telecomm. v. MCIMetro Access Transmission Serv., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) (court enjoined enforcement of Georgia Public Service Commission's order directing BellSouth to negotiate terms with customers, which would result in loss of 3200 customers per week); *Ferrero*, 923 F.2d at 1449 (injunction was proper when corporation would lose goodwill and long-time customers and have to layoff employees if former employee continued operating business in violation of non-competition clause).

### 2.  Trademark Infringement

Even if plaintiffs show a substantial likelihood of success on the merits, injunctive relief is improper unless plaintiffs also demonstrate irreparable injury. *Siegel*, 234 F.3d at 1176.  The court must consider several factors in determining whether a plaintiff faces a substantial theat of irreparable injury, including loss of control of reputation, loss of trade, loss of goodwill, and the likelihood of confusion. *Ferrellgas Partners, L.P. v. Barrow*, 143 Fed. Appx. 180 (11th Cir. 2005) (citing Third

and Seventh Circuit decisions). A plaintiff's delay in seeking injunctive relief "weighs against" their ability to show a threat of irreparable harm. *Hi-Tech Pharmaceuticals, Inc. v. Herbal Health Products, Inc.*, 311 F. Supp. 2d 1353, 1357 (N.D. Ga. 2004).

The purpose of a strong trademark is to give the owner exclusive use and control over its reputation. Confusion coupled with an infringer's inferior services injures the owner's goodwill and dilutes the distinctiveness of its product. *PepsiCo, Inc. v. #1 Wholesale, LLC*, 2007 WL 2142294 at *4 (N.D. Ga. 2007). The Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125(c), provides:

> (c) Dilution by blurring; dilution by tarnishment
> (1) Injunctive relief
> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.
> (2) Definitions
> (A) For purposes of paragraph (1), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
> (iii) The extent of actual recognition of the mark.
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*See also PepsiCo, Inc., supra* at *4 ("PepsiCo must show that: 1) the PepsiCo Marks are famous; 2) Sahni commenced using the PepsiCo Marks in commerce after they became famous; 3) Sahni's use of the PepsiCo Marks is likely to cause dilution. . ..").

Under Georgia law, injunctive relief is proper against someone who uses the same or similar trademark, and there is a likelihood of injury to the business' reputation or of dilution of the trademark's distinctive quality.  Ga. Code. Ann. § 10-1-451 (West 2010).

The Eleventh Circuit has held that "a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of substantial likelihood of prevailing on the merits and/or a substantial threat of irreparable harm."  *E. Remy Martin & Co. v. Shaw-Ross Int'l Imports*, 756 F.2d 1525, 1530 (11th Cir.1985); *see McDonald's Corp.*, 147 F.3d at 1310.  The court evaluates seven factors to determine whether two marks pose a likelihood of confusion:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Tana v. Dantanna's*, 611 F.3d 767, 774-75 (11th Cir. 2010) (citing *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007)); *accord Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d 1200, 1206 (11th Cir. 2008) (listing the same factors and citing Georgia case law).  While evidence of actual confusion is the best evidence to support a finding of a likelihood of confusion, it is not necessary.  *E. Remy Martin & Co.*, 756 F.2d at 1529.

When a trademark is not sufficiently distinctive to tie the trademarked product to the producer, the trademark holder has exclusive use only to the extent that the trademark has acquired secondary meaning.  *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513 (1984) (trademarked surname acquired secondary meaning sufficient to assert exclusive use).  Whether a trademark has secondary meaning depends on:

> (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name

and the plaintiff's product or business; and (4) the extent to which the public actually identifies the name with the plaintiff's product or venture.

*Id.* at 1513; *St. Luke's Cataract and Laser Institute, P.A. v. Sanderson*, 573 F.3d 1186, 1208-09 (11th Cir. 2009).   If the trademark is not distinctive enough to warrant exclusive use, the holder is not entitled to injunctive relief.

## C.  Plaintiffs' Third Required Proof:  Threatened Injury to Plaintiffs Outweighs Harm Caused to Defendants

### 1.  Restrictive Covenants

A restrictive covenant in a professional partnership agreement is void if it "needlessly oppresses one of the parties without affording any corresponding protection to the other."  *Broome v. Ginsberg*, 283 S.E.2d 1, 2 (Ga. Ct. App. 1981) (non-compete clause that prevented dentist from practicing was unreasonable because, after he left, the professional corporation existed solely to liquidate assets, so dentist could not be "competing" with it); *compare Broome, supra, with Pittman v. Coosa Medical Group, P.C.*, 685 S.E.2d 753, 756 (Ga. Ct. App. 2009).   To be reasonable, the restriction upon the professional must be only as large as necessary to protect the corporation.  *Id.* (citing *Taylor Freezer Sales, Co. v. Sweden Freezer Eastern Corp.*, 160 S.E.2d 356 (Ga. 1968)).  A restrictive covenant is enforceable, and a plaintiff can obtain a preliminary injunction, when the professional corporation is severely damaged despite efforts to rebuild.  *Pittman*, 685 S.E.2d at 756.  For example, in *Pittman*, a neurosurgeon who founded Coosa Medical Group left the corporation to work for a different company in violation of a non-competition clause in his contract with Coosa.  *Id.* at 754.  Coosa's president stated that "'when a physician leaves a group and sets up shop across town,' as opposed to leaving the community, 'all sorts of questions get raised. . ..'" *Id.* at 756.  The court found that injunctive relief was appropriate because Pittman's actions bore "direct relevance" on Coosa's ability to recruit new staff and rebuild the corporation.  *Id.*  In sum, a professional corporation has a legitimate business interest in restricting competition to protect the trust and confidence it built with its clients.  *Singer v. Habif, Arogeti*

*& Wynne, P.C.*, 297 S.E.2d 473, 475 (Ga. 1982).  However, this interest must be weighed against the impact on the professional's ability to conduct business.  *Id.*; *see also Augusta Eye Center, P.C. v. Duplessie*, 506 S.E.2d 242 (Ga. Ct. App.1998) (non-competition clause in former employee's contract must balance employee's right to earn a living without unreasonable restrictions with employer's right to protection from unfair appropriation of contacts developed while working for employer).

### 2. Trademark Infringement

Whether the threatened harm to the movant outweighs the threatened harm to the non-movant is a question of equity.  *See Citicasters Licenses, Inc. v. Cumulus Media, Inc.*, 189 F. Supp. 3d 1372, 1382 (S.D. Ga. 2002).  The court must consider the goodwill and name recognition of the parties' mark, the time and money invested in the mark, and economic loss if the court issued an injunction.  *Id.* (plaintiff corporation had forty radio stations and would suffer greater injury than defendant, though defendant would be harmed).  For example, the movant's assertion that it will suffer irreparable harm through dilution of its mark must be balanced against the non-movant's assertion that an injunction would effectively put him out of business.  *See E. Remy Martin & Co.*, 756 F.2d at 1534 (likelihood of confusion between marks and harm to goodwill and reputation outweighed non-movant's assertion that he would go out of business).  The court must evaluate the truth of the non-movant's claim in light of the evidence.  *Id.* (non-movant's business survived five years without selling wine with the infringing mark).  Furthermore, the court may weigh the fact that a defendant knew he was violating trademark rights and continued to do so for a long period against the defendant's asserted harm.  *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*, 642 F. Supp. 1031, 1040 (N.D. Ga. 1986) (manufacturer of "Garbage Pail Kids" continued to intentionally violate "Cabbage Patch Kids" manufacturer's rights and could not complain of threatened harm).

## D. Plaintiffs' Fourth Required Proof: Public Interest

### 1. Restrictive Covenants

A preliminary injunction cannot have an adverse impact on the public.[4] "Enforcement of an ostensibly enforceable covenant not to compete would not be adverse to the public interest." *Smallbizpros, Inc. v. Court*, 414 F. Supp. 2d 1245, 1251 (M.D. Ga. 2006) (franchisor-franchisee non-compete agreement). However, Georgia courts recognize that there is also a public interest in having the ability to choose the professional services it prefers. *Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1382 (N.D. Ga. 2001); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. de Liniere*, 572 F. Supp. 246, 249 (D.C. Ga. 1983) ("public has a greater interest in being able to choose whether to follow its broker to a new firm or to remain at the old firm with a new broker").

### 2. Trademark Infringement

Overwhelmingly, courts' evaluation of this prong focuses on the public's interest in preventing confusion in the marketplace. *See, e.g., Barrow*, 143 Fed. Appx. 180 (11th Cir. 2005); *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 264 F.3d 1297, 1304 (11th Cir. 2001).

## DISCUSSION

## A. Plaintiffs have not shown a substantial likelihood of success on the merits.

### 1. Restrictive Covenant

The contract specifies representative names for each party, and Santa Rosa's

---

[4] Courts generally do not expound on public interest prong because they deny the injunction on other grounds, thus failing to reach the final prong, or grant the injunction and summarily conclude it is not against the public interest .

representative name is "Physician" (doc. 8, ex. 6, p.1).  The signature block reads "FOR: PHYSICIAN" and is signed by Dr. Simpson.  Plaintiffs argue the designation "Physician" in conjunction with Dr. Simpson's signature shows that Dr. Simpson was a party to, and is liable under, the Agreement (doc. 19, p. 3).  In fact, repeatedly throughout their pleadings they assert that AHP and Dr. Simpson agreed to certain things.  This argument misstates the terms of the contract and comes close to lacking in professionalism.  Misleading the court is improper.  In addition, plaintiffs contend that some of the provisions to which "Physician" agrees could only refer to a person, not a business (doc. 19, p. 5-6).  For example, "Physician" is required to hold a valid medical license and carry professional malpractice insurance (doc. 8, ex. 8, p. 2; doc. 19, ex. 1, ¶ 6).  Furthermore, Gregory Wachowiak, President of AHP, stated in his affidavit that "[i]t is not uncommon in the industry for physicians to request that an agreement be put in the name of a company owned or partially owned by the physician."  (Doc. 19, ex. 1, ¶ 5).  Plaintiffs' reply adds:

> For various reasons, including insurance protection in addition to standard malpractice insurance, tax deductions and consequences, as well as other reasons made over the years, the independent contractor agreements entered into between Plaintiffs and its numerous providers, including Simpson, is, for the most part, always in the name of an entity that is controlled by the providers, including Simpson.

(Doc. 19, p. 3).  In fact, plaintiffs submitted an almost identical independent contractor agreement between AHP of Central Georgia, P.C., and Sunrise Lighthouse, Inc. (*see* March 14, 2011 Order on December 10, 2008 Agreement in *AHP of Cent. Ga., Inc. v. Sunrise Lighthouse, Inc., et al.*,  Superior Court of Dekalb County, Georgia, case no. 11CCV1659-9).  In that agreement, Sunrise Lighthouse, Inc. was designated "Anesthetist", and Sunrise Lighthouse, Inc.'s anesthetist signed under the block "FOR: ANESTHETIST".  The gravamen of plaintiffs' argument is that "[t]he party to the Agreement is inconsequential as many of the obligations imposed in the Agreement are directed to and limited to the physician executing the Agreement." (Doc. 19, p. 3).

  **Contract construction under Georgia law is a three-step process.** *Rolan v.* *Glass***, 699 S.E.2d 428, 432 (Ga. Ct. App. 2010). First, the court asks if the language is clear and unambiguous. If it is, the court enforces the contract according to its terms.** *Id.* **If it is ambiguous, the court applies the rules of construction to resolve the ambiguity.** *Id.* **Only if the contract cannot be construed with steps one and two does the court proceed to step three, which is to have a jury determine what the parties intended.** *Id.* **The court may use contemporaneously executed writings to fill in terms or correct obvious errors in the ambiguous document. Ga. Code. Ann. § 24-6-3 (West 2010). Parol evidence may be used to explain latent and patent ambiguities.** *Id.* **"A word or phrase is ambiguous when its meaning may fairly be understood in more ways than one."** *Rolan***, 699 S.E.3d at 432. Importantly, a contract is not ambiguous simply because it is difficult to construe.** *Lay Bros. , Inc.* *v. Golden Pantry Food Stores, Inc.***, 616 S.E.2d 160, 163 (Ga. Ct. App. 2005);** *Crooks* *v. Crim***, 285 S.E.2d 84, 87 (Ga. Ct. App. 1981).**

  **Plaintiffs' arguments fail under Georgia law. By the plain language of the Agreement, the contracting parties are AHP and Santa Rosa. While it is true that some of "Physician's" obligations under the contract are logically construed as personal obligations, the contract is not illogical by applying the unambiguous designations it establishes. The Georgia legislature intended contracts to be upheld in whole when possible, and when construction is doubtful, "that [construction] which goes most strongly against the party executing the instrument or undertaking the obligation" is preferred. Ga. Code Ann. §§ 13-2-2(4) & (5) (West 2010). Therefore, to the extent "Physician" is unclear—and the undersigned is not persuaded that it is—the meaning is construed against the drafter. As AHP's example of an almost identical agreement makes clear, it drafted this Agreement.**

  **Plaintiffs argument that "this is how the industry does it" is equally unpersuasive. "The custom of any business or trade shall be binding only when it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract, except in regard to those transactions covered by**

[the Commerical Code]."  Ga. Code Ann. § 13-2-2(3) (West 2010).  Plaintiffs' bare assertion in its reply, without citation to controlling authority, is not sufficient to show adding parties by implication is "universal practice" in the medical services industry.  Nor is Mr. Wachowiak's statement that the practice is "not uncommon" equivalent to a  "universal practice."  (*See* doc. 19, ex. 1, ¶ 5).  Therefore, under the State of Georgia's rules of contract construction, the undersigned finds that Dr. Simpson was not a party to the Agreement and is not liable under it.

### 2.  Trademark Infringement

Plaintiffs' likelihood of success on its trademark infringement claim is tied to its claim that AHS' business name causes a likelihood of confusion.  The likelihood of confusion is addressed in the next section concerning plaintiffs' lack of showing a substantial threat of irreparable injury.

### B.  Plaintiffs have not shown a substantial threat of irreparable injury if injunction does not issue.

### 1.  Restrictive Covenants

Plaintiffs claim AHP's business is "worth significantly less" without exclusivity, and allowing Santa Rosa and Dr. Simpson to continue providing services at Baptist would "utterly destroy the value of its business."  (Doc. 7, p. 14).  The undersigned does not agree.  The Administrator of Baptist Hospital swore in an affidavit that "[a]t the time of my discussion with Dr. Simpson, Baptist management had made the decision that it would not enter into a new agreement with AHP under any circumstances." (Doc. 8, ex. 1, ¶ 9).  AHP therefore has no monetary interest in providing anesthesia services to Baptist, so AHP's business worth in terms of monetary value does not justify a preliminary injunction.  *See Ferrero*, 923 F.2d at 1449.  Also, plaintiffs' counsel argued that AHS might rapidly expand, soliciting hospitals as far away as Gainesville, and in so doing severely impede AHP's ability to be profitable.  That contention is speculative and of little value.

On the other hand, AHP's business worth in terms of goodwill and loss of customers can constitute irreparable injury.  *See Bellsouth Telecomm.*, 425 F.3d at

970.   Whatever goodwill AHP built with Baptist was lost when the parties' negotiations over a new contract ceased after six months of disagreement.  Their relationship had so deteriorated that Baptist's Administrator stated Baptist was not interested in contracting with AHP "under any circumstances."  (Doc. 8, ex. 1, ¶ 9).  If AHP lost goodwill or customers, it was on account of its failed negotiations, not Dr. Simpson's subsequent proposal.  For these reasons, Santa Rosa cannot be said to be "competing" with AHP in violation of the Agreement.  In any event, Baptist's current agreement for medical services is with AHS, not Santa Rosa, and AHS is not bound by the terms of the Agreement.  Finally, as previously discussed, Dr. Simpson is not a party to the Agreement, so he is not personally liable for any violation of the Agreement.

### 2.  Trademark Infringement

Plaintiffs argue the business name Anesthesia Healthcare Solutions of North Florida, LLC, infringes on AHP's marks and poses a substantial threat of irreparable injury to its goodwill because there is a likelihood that consumers could confuse AHS' name and services with AHP's (doc. 7, p. 15).  A sufficiently strong possibility of confusion is grounds for a preliminary injunction.  *McDonald's Corp.*, 147 F.3d at 1310.  Applying the Georgia Code and Eleventh Circuit precedent, the undersigned evaluates the factors to determine if there is a "likelihood of injury to the business' reputation or of dilution of the trademark's distinctive quality."  *See* Ga. Code Ann. § 10-1-451; *Tana*, 611 F.3d at 774-75.   AHP holds two marks: one is for the Anesthesia Healthcare Partners Inc. logo, as a whole, and the other is for the abbreviation "AHP" (doc. 8, exs. 8 & 9).

AHP's marks are not very strong or distinct.   The four categories of distinctiveness, listed in descending order of strength, are (1) fanciful or arbitrary, (2) suggestive, (3) descriptive, and (4) generic.  *Welding Serv., Inc.,* 509 F.3d at 1357-58.  The fanciful and arbitrary categories are inapplicable here.  "A suggestive mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product."  *Id.*  A descriptive mark identifies a characteristic

or quality of the service or product. *Id.* A descriptive mark must acquire secondary meaning before it is protected. *Id.* at 1358. Generic marks do not receive any protection. *Id.*

AHP's marks are similar to the marks in *Welding Services, supra*. In that case, Welding Services, Inc. sought protection for the abbreviation "WSI" and its logo. The court stated that abbreviations become protectable only if the plaintiff shows the abbreviation "has a meaning distinct from the underlying words in the mind of the public." *Id.* at 1359. The court found that while Welding Services argued it invested significantly in building its marks, it did not address whether that investment gave the abbreviation a meaning distinct from the company's individual words. *Id.* Therefore, the abbreviation was not protected. Plaintiffs here failed to address the significance of the mark "AHP," and have not argued that it has any meaning distinct from the individual words "Anesthesia Healthcare Partners." Therefore, the undersigned finds it inappropriate to consider issuing a preliminary injunction based on AHP's mark, "AHP".

While the court in *Welding Services* noted that "a logo consisting of a nonprotectable literal element combined with a display or geometric design may be distinctive enough to receive protection," it also stated the company's logo was "not particularly distinctive, consisting of three letters in a circle." *Id.* at 1360. However, the court declined to address the question of protection of the logo because Welding Services failed on the ground of likelihood of confusion. *Id.* There was "undisputed similarity of services offered, sales methods, and advertising methods," but the two logos were not similar. *Id.* at 1361. Finally, Welding Services asserted it had shown actual confusion because some customers had asked whether the second company was "affiliated with WSI," but the court disagreed:

> These incidents have no explicit connection to the stylized logos. As the district court remarked, their probative value is very low because of the uncertainty about what might have prompted the inquiries. Welding Technologies' employees were formerly associated with Welding Services, so the confusion could just as likely have arisen because of the personnel rather than the logo. Moreover, the nature of the

> **business at issue here requires that the purchasers of the services must be sophisticated consumers, since the services are technical and large-scale.  Such purchasers are less likely to be confused than casual purchasers of small items.**

*Id.*; *cf. St. Luke's Cataract*, 573 F.3d at 1209 (there was a likelihood of confusion when the defendant used the same name, website, and logo in the same geographical market to target the same customers for the same services).  Like the logo in *Welding Services, Inc.*, AHP's logo is not distinctive and consists of the abbreviation "AHP" placed over the words "Anesthesia Healthcare Partners" accompanied by a stylized half-ellipsis (doc. 8, ex. 8).  The nature of AHP's business also lends itself to sophisticated consumers, mainly hospitals, who are not likely to be confused.  Baptist, which is the only hospital AHP claims to have any dealings with, has certainly shown that it is not confused.  Any similarity in the company's names is far outweighed by the unlikeliness of confusion.  AHP has not shown a substantial threat of irreparable injury.

**C.  The threatened injury to plaintiffs does not outweigh the harm caused to defendants.**

**1.  Restrictive Covenant**

Relying on Third Circuit Court of Appeals precedent, plaintiffs argue any injury to defendants is "'self-inflicted' and cannot be deemed irreparable as a matter of law."  (Doc. 7, p. 17; doc. 19, p. 15-16).  They state that Santa Rosa and Dr. Simpson were aware of the restrictions and Baptist's legal counsel requested that Dr. Simpson be released from the restrictions, as other employees had been (*id.*).  Plaintiffs also reassert that AHP's exclusive contracts and reputation are diluted with "each passing day."  (Doc. 7, p. 17).

The undersigned has previously rejected plaintiffs' exclusivity and reputation arguments and will not readdress them here.  Under Georgia law, a restrictive covenant in a professional partnership agreement is void if it is larger than necessary to protect the corporation or "needlessly oppresses one of the parties without affording any corresponding protection to the other."  *Broome*, 283 S.E.2d

at 2.   If enforced, the Agreement harms Dr. Simpson to the extent that it is enforceable against Santa Rosa, as he is still a member of that enterprise. Accordingly, as plaintiffs argue, Dr. Simpson would have to resign as a member of the medical staff at Baptist (doc. 8, ex. 6, p. 8).  He would lose his job.  In contrast, AHP does not appear to gain anything, except to have a court validate the terms of its contract, which is expired.  It is undisputed that AHP will not regain Baptist as a client, better its reputation, increase its goodwill or even its income.  Under the facts of this case, clause eleven of "Physician's" obligations under the Agreement, to "relinquish all privileges in anesthesia and resign from the medical staff of Hospital effective with the termination of this Agreement," is an unreasonable restriction on Santa Rosa, as its owner would be permanently foreclosed from performing anesthesia services at Baptist Hospital, and Santa Rosa's ability to remain a profitable business would be impacted, while AHP would gain absolutely nothing with respect to Baptist.

Georgia courts do not follow to the "blue pencil" doctrine of severability. *Waldeck*, 583 S.E.2d at 269; *see also Pregler v. C&Z, Inc.*, 575 S.E.2d 915, 916 (Ga. Ct. App. 2003 (rule is derived from restrictive covenant cases strictly scrutinized as employment contracts).  Therefore, when one restrictive covenant is unreasonable "either in time, territory, or prohibited business activity," then all restrictive covenants in the same contract are unenforceable.  *Ward v. Process Control Corp.*, 277 S.E.2d 671, 673 (Ga. 1981) (employment contracts).  For the purposes of a preliminary injunction, because this restrictive covenant is overly broad and void, the remaining restrictive covenants also should be void.  *Id.*

2.  Trademark Infringement

Plaintiffs make similar arguments that any harm to AHS is self-inflicted, and AHP would suffer greater harm because it has spent significant time and money promoting its marks (doc. 7, p. 18).  AHP contends that if it did show AHS infringed on its mark, AHP would suffer greater harm if the infringement continued.  AHS was formed on August, 11, 2010, while AHP registered its logo in 2008 (doc. 8, ex. 5 & 8).

However, for purposes of a preliminary injunction, plaintiffs have not shown that AHS infringed on a protectable mark, or that AHP suffers a threat of irreparable harm if AHS continues to do business under that name.  Therefore, plaintiffs have not shown that they face a greater threat of harm than defendants if the court enjoined AHS from using its name.

## D. Plaintiffs did not show an injunction does not disserve the public interest.

### 1.  Restrictive Covenant

In their motion, plaintiffs only touch on the public interest prong by stating, without legal support, that it is in the public's interest to require parties to honor their contractual obligations (doc. 7, p. 19).  In their reply, they cite to two Georgia Supreme Court cases from 1965 and 1985 for the proposition that "[t]here is a long line of cases which state that the public interest is better served by the enforcement of contracts and that restrictions on the practice of medicine do not offend the public interest."  (Doc. 19, p. 19-20 (citing *McMurray v. Bateman*, 144 S.E.2d 345 (Ga. 1965) and *Rash v. Toccoa*, 320 S.E.2d 170 (1984))).  A review of the *Rash* opinion reveals that counsel for the defendant, in 1984, argued that the court's recitation of cases starting in 1898 was "outdated in light of a trend toward more strict interpretation in cases."  320 S.E.2d at 172.  In rejecting counsel's argument, the court stated that the argument was inaccurate, and none of counsel's supporting cases dealt with medical partnership agreements.  *Id.*  One of the cases counsel relied on was *Singer v. Habif, Arogeti & Wynne, P.C.*, *supra*, which is now commonly cited in cases reviewing all types of professional partnership agreements.  *See id.*

Plaintiffs' argument that courts should blindly accept contracts restricting the practice of medicine as being in the public's interest is outdated, as a review of case law since 1984 shows.  Plaintiffs have not shown that enjoining defendants from providing services at Baptist would not disserve the public interest.

**2. Trademark Infringement**

Plaintiffs address this prong by stating that the public has an interest in avoiding confusion in the marketplace, and AHS' similar name as well as Dr. Simpson's presence at Baptist will lead to confusion among the public and patients (doc. 7, p. 19).  But the public here are hospitals, not members of the public generally, so sophistication on the part of the consumer can be assumed.  As the undersigned has already addressed these arguments, they will not be restated here.

For the reasons stated above, but above all because (1) Dr. Simpson was not a party to the Agreement and therefore could not have violated its restrictive covenants, and (2) plaintiffs have not shown and cannot show any substantial threat of irreparable injury, it is respectfully RECOMMENDED that plaintiffs' motion for preliminary injunction (doc. 7) be denied.


At Pensacola, Florida, this 20th day of May, 2011.


/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. See 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).**